<u>FOR PUBLICATION</u>

UNITED STATES BANKRUPTCYCOURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                        :       Chapter 13
In re:                                                  :
                                                        :       Case No. 07-36853 (cgm)
        JUDITH ANNE CRAWFORD,                           :
                                                        :
                                    Debtor.             :
                                                        :
-------------------------------------------------------------X

**MEMORANDUM DECISION ON ORDER DIRECTING SECURED CREDITOR AND
FORECLOSURE REFEREE TO APPEAR AND SHOW CAUSE WHY THEY SHOULD
NOT BE LIABLE FOR VIOLATION OF THE AUTOMATIC STAY AND
<u>WHY POST-PETITION FORECLOSURE SALE SHOULD NOT BE VACATED</u>**

<u>A P P E A R A N C E S</u> :

John A. DiCaro, Esq.
Anne E. Miller-Hulbert, Esq.
Shapiro & DiCaro, LLP
250 Mile Crossing Boulevard
Rochester, New York
*Attorneys for Ocwen Loan Servicing, LLC*

Frank M. Mora, Esq., *pro se*

Martin Crawford, *pro se*

**CECELIA G. MORRIS
UNITED STATES BANKRUPTCY JUDGE**

        The Court issued an order to show cause and conducted two evidentiary hearings in this

case based upon a claim by the non-filing spouse (a co-owner of the real property and co-debtor

on the note and mortgage) that the secured creditor and the referee appointed by the state court

violated the automatic stay by proceeding with a post-petition foreclosure sale.  The referee

continued with the foreclosure sale, and the secured creditor submitted a bid, even though the co-

debtor faxed a notice of the filing to the referee the day before and physically appeared at the

foreclosure sale and presented the referee with a copy of the bankruptcy petition.  Prior to the

foreclosure sale, the referee made at least two announcements to everyone present at the sale that

a bankruptcy petition appeared to have been filed.  The referee expressed his intention to proceed

with the sale with the "caveat" that if the sale violated the automatic stay, it would be invalid.

The referee testified that he made a similar statement to the secured creditor's agent after the sale

was conducted.  Incredulously, the secured creditor's agent, the only bidder at the foreclosure

sale, could not recall a single detail of the foreclosure sale and retained no records.  The secured

creditor's mortgage servicer agrees that the foreclosure sale was invalid and that it put the

foreclosure sale "on hold."  The proof of claim filed in this bankruptcy case by the mortgage

servicer on behalf of the secured creditor may include costs and fees of the mortgage servicer

related to the invalid foreclosure sale.

Following the evidentiary hearing, the Court ruled that the referee and the secured

creditor willfully violated the automatic stay, and they are jointly liable with the secured

creditor's agent for the actual damages of the debtor and co-debtor under 11 U.S.C. § 362(k)(1).

For the reasons set forth below, punitive damages will also be assessed in this case against the

secured creditor and its agent.

The following constitutes the Court's findings of fact and conclusions of law pursuant to

Fed. R. Civ. P. 52(a), made applicable to this contested matter by Fed. R. Bankr. P. 7052 and

9014(c).

## Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984.  This is a "core proceeding" under 28 U.S.C. § 157(b)(2).  *See In re Ionosphere Clubs Inc.*, 124 B.R. 635, 638 (S.D.N.Y. 1991) (enforcement of automatic stay is core proceeding and "essential to orderly and equitable administration of the estate").

## Background

Debtor filed the above-captioned Chapter 13 case on November 26, 2007. Electronic Case Filing ("ECF") Docket No. 1.  The Debtor's bankruptcy petition indicated a street address in LaGrangeville, New York and listed "OCWEN Federal Bank FSB" as a creditor.  On December 11, 2007 the Debtor sent a letter to the Chapter 13 Trustee asking to withdraw her petition. ECF Docket No. 9.  The letter stated:

> I am forced to withdraw my filing for protection under Bankruptcy Chapter 13 as HSBC Bank USA (represented by Shapiro & DiCaro, of Rochester, NY) and Referee Frank M. Mora, Esq. (of Poughkeepsie, NY) sold my house at public auction on 11/27/2007 at 10:00 A.M. at the Dutchess County Courthouse in Poughkeepsie NY.
>
> Mr. Mora was personally served a copy of my bankruptcy filing prior to the sale and he acknowledged that both he and Shapiro & DiCaro had received a fax informing them of the filing the previous day but he sold the property anyway. As this was my primary asset for which I was seeking protection, I see no need for me to continue with this proceeding.

The Debtor did not ask the Court to dismiss her case, and when her letter came to the Court's attention, a hearing was scheduled on January 8, 2008.  At the January 8, 2008 hearing, the Debtor's spouse, Martin Crawford, appeared on behalf of the Debtor.[1]  Mr. Crawford is listed on the mortgage as a co-borrower with the Debtor on their home in LaGrangeville.  Mr. Crawford

---

[1]   The Court received a letter dated February 28, 2008 from one of the Debtor's doctors.  Due to the Debtor's medical condition, as described in the letter, the Court excused her from attendance at these hearings.

stated under oath that on the afternoon before the foreclosure sale on their home, he faxed a copy of the bankruptcy petition to the secured creditor, "HSBC Bank USA, N.A., as Trustee for the registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2004-IN1, Asset Backed Pass-Through Certificates" (hereafter, "HSBC") and Referee Frank M. Mora, Esq. (hereafter, the "Referee").  Mr. Crawford also testified that the Referee continued with the foreclosure sale even though Mr. Crawford appeared at the foreclosure sale and presented the Referee with a copy of the bankruptcy petition.  Mr. Crawford filed supporting documentation with the Court on January 9, 2008. ECF Docket No. 12.

Based upon Mr. Crawford's testimony and supporting documentation, the Court issued an order directing HSBC and the Referee to show cause why they should not be held liable for willfully violating the automatic stay. ECF Docket No. 13 (hereafter, the "Order to Show Cause").  The Order to Show Cause scheduled a hearing on February 5, 2008.

In response to the Order to Show Cause, an attorney affirmation was filed by the law firm Shapiro & DiCaro, LLP, representing Ocwen Loan Servicing ("Ocwen"). ECF Docket No. 14 (hereafter, the "Response").  Ocwen is described as "the servicing agent for HSBC Bank, USA, as Trustee, which holds a mortgage on the Debtor's real property." Response, ¶2.  In the Response, attorney John A. DiCaro stated that Mr. Crawford's fax to his law office the afternoon prior to the foreclosure sale would not have been received because it was sent to an incorrect fax number. *Id.*, ¶4.  Mr. DiCaro stated that the Referee "did not contact our office prior to the foreclosure to advise us of the Debtor's bankruptcy filing," and that: "Our records reflect that we did not learn of the Debtor's Chapter 13 bankruptcy filing [until] November 29, 2007 which was two days after the sale.  We immediately advised our client that the sale was invalid and put our foreclosure file on hold due to the pending bankruptcy filing." Response, ¶5.  Mr. DiCaro then

stated: "It is also our understanding that **Mr. Mora announced the fact that a bankruptcy filing had been made prior to conducting the sale**." Response, ¶7 (emphasis added). Mr. DiCaro concluded:

> It is clear that the foreclosure sale conducted herein was void due to the existence of the stay. It is further respectfully submitted that Debtor has suffered no prejudice or damage as a result of the foreclosure sale . . . **given that an announcement of the bankruptcy was made at the sale, the lender was the only bidder and the foreclosure action was immediately placed on hold**.

*Id*., ¶8 (emphasis added). Mr. DiCaro's response raised as many questions as it answered. In using the words "we" and "our," Mr. DiCaro appeared to be speaking primarily on behalf of his firm. Thus, when Mr. DiCaro stated "[o]ur records reflect that we did not learn of the Debtor's Chapter 13 bankruptcy filing [until] November 29, 2007," he did not address whether or not HSBC and/or Ocwen had knowledge of the filing prior to that time. Moreover, Mr. Dicaro's statement that the Referee "announced the fact that a bankruptcy filing had been made prior to conducting the sale" begs the question: To whom did the Referee make the announcement? In the final paragraph of the Response, Mr. DiCaro again stated that the bankruptcy filing was announced and that "the lender was the only bidder." The statement suggested that an HSBC/Ocwen representative was present at the foreclosure sale, heard the Referee's announcement, and then proceeded to bid on the Debtor's real property, in deliberate violation of the automatic stay.

**The February 5, 2008 Hearing**

Mr. Crawford, the Referee and Ocwen (by Mr. DiCaro) appeared at the February 5, 2008 hearing on the Order to Show Cause. The Referee acknowledged that he received a fax of the petition from Mr. Crawford on the morning of the foreclosure sale and prior to the sale. The

Referee testified that he called either Shapiro & DiCaro or an agency representing HSBC[2] to ask whether the sale would go forward, but he did not mention the bankruptcy filing at that time. The Referee also confirmed that Mr. Crawford was present at the foreclosure sale and handed him another copy of the bankruptcy petition. The Referee testified that, prior to conducting the sale, he announced to all bidders that a bankruptcy petition had been filed. The Referee then proceeded to conduct the sale with the "caveat" that the sale would be null and void if the bankruptcy filing stayed the sale. At that point, according to Mr. Mora, an individual named Thomas Didonato, acting on behalf of HSBC, was the successful, and only, bidder on the Debtor's property.

According to the Referee, he called Mr. Crawford the following day to tell him that the foreclosure sale was null and void, and that the Referee would not sign any documents transferring the deed. The Referee further testified that he never signed any deed or transfer document with regard to the foreclosure sale.

Mr. Crawford testified that his recollection of the call from Mr. Mora was different, that Mr. Mora was still unsure of the status, and that in the days following the foreclosure sale, he received seven or eight calls from a real estate agent asking him when the premises would be vacated.

Based upon the foregoing testimony, the Court adjourned the hearing to April 28, 2008 and directed Thomas Didonato and a representative of Ocwen to appear at that time.[3]

---

[2]	Mr. Mora testified more specifically at the April 28, 2008 hearing that someone in his office attempted to call an entity known as FIS Agency Sales & Posting to find out if the sale would be going forward.

[3]	The Court did not order Ocwen or Mr. Didonato to appear because Mr. DiCaro assured the Court that such an order would not be necessary.

**Ocwen's Affidavit and Supplemental Attorney Affirmation**

In anticipation of the April 28, 2008 hearing, Ocwen filed an affidavit executed by Jessica Dybas, the "Default Servicing Liaison of Ocwen Loan Servicing, LLC." ECF Docket No. 16 (hereafter, "Dybas Aff."). Ocwen, according to Ms. Dybas, is a corporation which is the mortgage loan servicing agent for HSBC. Dybas Aff., ¶1.

According to Ms. Dybas, a foreclosure sale on the Debtor's property was originally scheduled for August 22, 2007 but that sale was stayed by Mr. Crawford's Chapter 13 bankruptcy filing. Case No. 07-36263 (Bankr. S.D.N.Y.). Mr. Crawford's case was dismissed by order dated October 17, 2007. The second foreclosure sale was scheduled for November 27, 2007. In her affidavit, Ms. Dybas states: "Unbeknownst to [Ocwen], or your deponent," Mrs. Crawford filed this petition on November 26, 2007 and "was allegedly conveyed to Mr. Mora by fax on that date." Dybas Aff., ¶6. According to Ms. Dybas, "[n]either [Ocwen] nor Ocwen's attorneys Shapiro & DiCaro, LLP, were notified of the filing prior to the scheduled foreclosure sale." *Id.* Ms. Dybas then states:

> Upon information and belief, Mr. Mora was not completely sure of the effect of the filing of a bankruptcy petition with regard to the imposition of an automatic stay. He therefore conducted a foreclosure sale on November 27, 2007, although **he apparently notified the prospective bidders thereat that the sale was possibly subject to being void due to the bankruptcy filing.** Mr. Crawford was also allegedly at the foreclosure sale.
>
> **Ocwen's attorneys had an agent**, Thomas Didonato at the foreclosure sale for the purpose of making a bid at the foreclosure sale. **Mr. Didonato did make that bid and Ocwen was the successful purchaser at the sale.**
>
> My review of Ocwen's internal records regarding this file indicate that, upon learning that it was the successful purchaser at the sale, Ocwen notified a realtor to begin efforts to market the property.
>
> Ocwen learned of Mrs. Crawford's bankruptcy filing two days later, on November 29, 2007. Ocwen confirmed without our counsel that the fact of the filing meant that the foreclosure sale was invalid.
>
> It is Ocwen's common practice in such a circumstance to contact our realtor and stop any activity when a bankruptcy petition is filed. My research into this matter

indicates that **the personnel responsible believe that they did, in fact, notify the realtor to that effect, however, they do not have any documentation of the fact that they did so**.  Once again, however, it is Ocwen's typical practice to immediately cease activity once information is received regarding filing of a bankruptcy.

I can state affirmatively to the Court that Ocwen is aware of its responsibilities pursuant to the Bankruptcy Code and based upon my review of the circumstances herein, Ocwen took no steps that could properly be deemed as a willfull [sic] violation of the automatic stay with regard to this matter.

*Id.*, ¶¶ 7-12 (emphasis added).

Mr. DiCaro also filed a supplemental affirmation, stating that, based upon the testimony of the Referee at the February 5, 2008 hearing, "it is clear that no officer, employee **or agent** of HSBC or Ocwen knowingly took any step which was a violation of the automatic stay." ECF Docket No. 15 (emphasis added).

### <u>The April 28, 2008 Hearing</u>

After additional testimony from Mr. Crawford, the Court heard testimony from Ms. Dybas, Mr. Didonato, and the Referee.

#### *Jessica Dybas*

On behalf of Ocwen, Ms. Dybas testified that Ocwen first received information concerning the bankruptcy filing on November 29, 2007, two days after the sale occurred. Transcript of the April 28, 2008 Hearing (ECF Docket No. 18; hereafter, "<u>Tr.</u>"), p. 17, 19.  Ms. Dybas testified that Ocwen typically assigns a realtor to a property as soon as it learns that it is the successful bidder at a foreclosure sale and did so in this case. Tr. at 17-18.  However, as soon as Ocwen was informed of the bankruptcy filing, it "stopped all the after-foreclosure processes and immediately opened up a bankruptcy module." Tr. at 17, 18.

The Court was primarily interested in the proof of claim filed in this case by Ocwen on behalf of HSBC.  According to Ms. Dybas, HSBC owns the loan, and Ocwen services it. Tr. at

20-21.  The charges included in Exhibit C to the proof of claim, captioned "Pre-Petition Fee,

Costs & Property Preservation Expenses Breakdown" are charges assessed by Ocwen. Tr. at 21.

THE COURT: I don't have dates on Exhibit C . . . .  What are those foreclosure costs for?

MS. DYBAS: Those are the costs that are associated with the foreclosures that have been initiated on the account.

THE COURT: Including the one we're talking about today?

MS. DYBAS: If that's – is that the latest?

THE COURT: I don't have a –

MS. DYBAS:  Is –

THE COURT:  – clue. There's not a date on here.

MS. DYBAS: Is there – is that an – that's an attachment, correct –

THE COURT:  Yes.

MS. DYBAS: – to a proof of claim?

THE COURT:  Uh-huh, Exhibit C.

* * *

MS. DYBAS: Yes, this is associated with the latest foreclosure.

THE COURT: Okay. Thank you.

* * *

THE COURT: So these are associated with this foreclosure?

MS. DYBAS: Those are associated with that foreclosure and any prior foreclosures that may have been on the account.

THE COURT: But you don't have them broken down by date?

MS. DYBAS: No, they're not broken down by date in the exhibits.

THE COURT: And the same with the bankruptcy fees. They are not broken down by date either, are they?

MS. DYBAS: No, ma'am.

THE COURT: So the amount of arrears of $59,042.28 includes these foreclosure fees that may – or do include this particular foreclosure?

MS. DYBAS: Correct.

MR. DI CARO: I'm going to object, Judge. It sounds –

THE COURT: It would be – this proof of claim was filed after you got notice that the foreclosure was invalid?

MS. DYBAS: Correct.

Tr. at 21-23.

### *Thomas Didonato*

Mr. DiCaro stated at the April 28, 2008 hearing that Mr. Didonato acted as Ocwen's

agent at the foreclosure sale and bid on Ocwen's behalf,[4] and his employer, Nationwide Court

Service, was hired by the Shapiro & DiCaro firm for that purpose. Tr. at 5, 25-26.

Mr. Didonato's total lack of recollection of anything that occurred at the sale is

remarkable:

> THE COURT: And do you know who the principal was in this that hired Nationwide Court Service for this foreclosure?
>
> MR. DIDONATO: I received a package. What happens is whoever – I'm sent a list of my foreclosures. I do three counties. Particularly this day I was in Dutchess County. They send me the sales, so the office is aware of who it is. And then when I receive the package, I will see on it it'll say Shapiro DiCaro.
>
> THE COURT: So do you make an assumption then of who or do you know what bank you're representing?
>
> MR. DIDONATO: No, I do – I have no idea until I actually receive the paperwork and it says who – what the account is or who the foreclosure is with. I have no – I have nothing – I know nothing until I actually receive the paperwork and show up at the sale.
>
> THE COURT:  Okay, and you had Mr. Crawford's and Ms. Crawford's foreclosure and you were at that foreclosure sale?
>
> MR. DIDONATO: As of that day, yes.
>
> THE COURT: Did you hear the announcement that this case was in bankruptcy?
>
> MR. DIDONATO: I am – I don't remember anything.
>
> THE COURT: You don't remember anyone saying that it was in –
>
> MR. DIDONATO: I don't remember anything of that day. I had four sales that day –
>
> THE COURT: You don't –
>
> MR. DIDONATO: – but I don't remember anybody saying anything.
>
> THE COURT: Have you ever seen Mr. Crawford before?
>
> MR. DIDONATO: I don't recall his face.

---

[4]    Other testimony, including other statements made my Mr. DiCaro, make it clear that Mr. Didonato was acting on behalf of HSBC, the mortgagee, for which Ocwen is the servicing agent.

THE COURT: And you don't recall Mr. Crawford at that sale?

MR. DIDONATO: I – like I said, I do not remember anything from that day. I mean, I do so many of them that I just – once it's done, I send the package back, you know, the results in, and then I just go on with my day. I keep no records of – you know, everything is sent back to the office or I call in the results of the sale.

THE COURT: And who do you call the results of the sale into?

MR. DIDONATO: Into Nationwide Court Service.

THE COURT: Do you have your paperwork from that day?

MR. DIDONATO: No.

THE COURT: Where is that paperwork?

MR. DIDONATO: That would have been sent – what happens is I'm sent the package. Sometimes it's just the terms of sale, sometimes the deed is put in there. The terms of sale are signed and then I send it back. If it's a FedEx package, I send it directly back to whoever the plaintiff's attorney is. And other times they'll just send me a manila envelope with the terms of sale and in that case I would have the terms of sale signed and then sent back to our office.

THE COURT: And at this particular foreclosure, do you recall Mr. [Mora] announcing that there was a possibility –

MR. DIDONATO: No.

THE COURT: – of bankruptcy?

MR. DIDONATO: I do not remember.

Tr. at 26-28.  The Court then provided Mr. Crawford with an opportunity to examine Mr.

Didonato.  As he did on several occasions during the Court's examination, Mr. Didonato's

answer – that he did not remember – sometimes preceded the completion of Mr. Crawford's

questions:

MR. CRAWFORD: Did you see me serve Mr. Maro with the papers?

MR. DIDONATO: I do not –

MR. CRAWFORD: The bankruptcy papers?

MR. DIDONATO: I do not remember. No.

MR. CRAWFORD: Okay. After the sale, do you remember me coming over and speaking to you?

MR. DIDONATO: No. Not at all, sir.

MR. CRAWFORD: So you do not remember me asking –

MR. DIDONATO: I don't –

MR. CRAWFORD: – who you were and you told me you were –

MR. DIDONATO: I might have said that. I don't –

MR. CRAWFORD: – and agent –

MR. DIDONATO: I was not there.

THE COURT: Let him –

MR. DIDONATO: I don't remember –

THE COURT: – finish his question.

MR. DIDONATO: Yeah.

MR. CRAWFORD: Do you recall me asking me (sic) who you were?

MR. DIDONATO: No.

MR. CRAWFORD: Okay.

MR. DIDONATO: Not at all, sir.

MR. CRAWFORD: Do you recall me – you – then you don't remember me –

MR. DIDONATO: No, I don't.

MR. DIDONATO: Are you saying to me that you were an agent for the bank and you were signing papers there for the deed?

MR. DIDONATO: I don't – sir, I honestly do not remember who you are and I've never – I mean, I don't remember. I'm sorry.

Tr. at 32-33.  Mr. Didonato's testimony was not persuasive, and the Court told him so after

examining him, interrupting a line of questioning by Mr. DiCaro:

MR. DICARO: Where do the foreclosure sales take place?

MR. DIDONATO: They take place in the rear vestibule of the actual courthouse itself, which is just a regular room where the – I guess the jurors come through for whenever they have a case that they come across the street, and then there's a guard down there. But you just walk –

THE COURT: If I told you I don't believe you, would you – what would you say to that?  Because I don't believe you.

MR. DIDONATO: I'm just telling you that that's where the sales take place.

THE COURT: No, I meant about not knowing about Mr. Crawford –

MR. DIDONATO: I do not remember. I honestly do not remember. I would – if I would tell you if I remember, but I do not – I don't even remember the sale itself.

THE COURT: Is it often that someone announces that there's a bankruptcy in a case?

MR. DIDONATO: To my knowledge, if I heard the word bankruptcy stated here, I would have made a phone call to our office and then they would have contacted the plaintiff's attorney directly. I do not remember anybody stating anything, because if I would have heard the word bankruptcy, I would have made a phone call because that's what I do.  I – if I – if there's any type of bankruptcy filed or there's any kind of problem with the sale, I always make a phone call prior to the sale so that they can contact the plaintiff's attorney to – you know, to inquire about what's going on.

Tr. at 28-29.

### *The Referee*

Mr. Didonato's testimony as to what he could not remember does not contradict the Referee's credible and detailed recollection of the events at the foreclosure sale.  At the foreclosure sale location, the Referee met Mr. Crawford, who handed him another copy of the bankruptcy petition. Tr. at 37.  The Referee then offered the following account of the foreclosure sale:

So I explained [to Mr. Crawford] that I don't know if I'm supposed to go forward, if I'm supposed to stop.  So I'm going to go forward.  However, if this is an accurate and true filing and it is stayed, it's going to be null and void.  It's going to be like this never even happened.  That is the statement I made.

* * *

So Mr. Didonato did come and he handed me the terms of sale, like I've done many of these similar thing.  I asked does anyone want me to read these or can I waive them.  Nobody said anything, so I waived them.  I said – **then I made the announcement again**.  I said, Mr. Crawford handed me a petition, which appears to be a bankruptcy petition.  Same thing I just said, I'm not sure if this is – is going to be a good sale, so from this moment – you know, when we do the sale, if it [is] a valid one, it's going to be null and void as if it never happened.  That's the statement I made.

I said, okay, are there any bidders on this?  No one said anything.  **Mr. Didonato then said, I bid on behalf of HSBC Bank $316,916.74.**  I said, are there any other bidders?  No one said anything.  Going once, going twice, **sold to the bank, assuming this is a valid sale**.

What normally happens then, Mr. Didonato or whoever's there for the foreclosure people would hand me a couple copies of the terms of sale and a memorandum of sale, which I normally fill out, I sign, and the purchaser or the representative signs.  I keep a copy and I give a copy back to them.

- 13 -

> In this instance, I said, thank you for giving me this.  You can sign it.  **If it's valid, I'll send it back.  But I'm keeping this in my file in case it's not valid.**

Tr. at 39-40 (emphasis added).  Upon the Court's clarification, the Referee confirmed that he made a direct statement to Mr. Didonato concerning this bankruptcy filing:

> I said, I have this filing.  I don't know if it's valid.  I'm not going to do like I normally do; sign this and give it back to you.  You sign it, give it to me, and if it's valid, I'll send it in.

Tr. at 40.  The Referee testified that he never signed the terms of sale, memorandum of sale or deed, and when realized that the foreclosure sale was conducted in violation of the automatic stay, he immediately contacted the Debtor and Mr. Crawford to inform them that the sale was invalid and that no deed would be signed. Tr. at 41-43.

## <u>DISCUSSION</u>

Pursuant to 11 U.S.C. § 362(a), the filing of a bankruptcy petition "operates as a stay, applicable to all entities" of various collection activities, including the continuation of a judicial action or proceeding against the debtor, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," and "any act to create, perfect, or enforce any lien against property of the estate."  "The automatic stay is effective as of the moment of filing of the bankruptcy petition." *In re Stucka*, 77 B.R. 777, 782 (Bankr. C.D. Cal. 1987).

The Debtor's real property constitutes "property of the estate" protected by the automatic stay. 11 U.S.C. § 541(a).  In this Chapter 13 case, the automatic stay applies to any act to collect a debt against Mr. Crawford, because he is a co-debtor on the note and mortgage. 11 U.S.C. § 1301(a).

Section 362(k)(1) of the Bankruptcy Code provides in relevant part:

> [A]n individual injured by any willful violation of a stay provided by this section
> shall recover actual damages, including costs and attorneys' fees, and, in
> appropriate circumstances, may recover punitive damages.

Section 362(k)(1) mandates an award of actual damages to an individual where the violation is willful, and the Court has discretion to assess punitive damages. Even where a stay violation is not willful, the act taken in violation of the stay is void *ab initio*. *See In re Patti*, 2001 WL 1188218, * 7 (Bankr. E.D. Pa. Sept. 14, 2001). "A violation of the automatic stay is just that, a violation of the automatic stay – there is no such thing as a slight violation." *In re Singer Co. N.V.*, 2000 WL 33716976, *3 (Bankr. S.D.N.Y. Nov. 3, 2000) (rejecting argument that violation was only a "brief" one).

There is no dispute that the foreclosure sale violated the stay in this case. The Referee violated Section 362(a)(1) by continuing an action against the debtor that was commenced prior to the bankruptcy filing. HSBC, through its agents, violated Section 362(a)(3), which bars "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Therefore, the sale is void *ab initio*, regardless of whether or not the stay violations were willful. Although the Referee testified that he did not sign the deed of sale in this case and took all steps necessary to cancel the sale, the Court will also issue an order declaring the November 27, 2007 sale invalid.

## I.    THE VIOLATION WAS WILLFUL

### A.    HSBC, Ocwen and Other Agents

Ocwen responded to the Court's Order to Show Cause against HSBC and claims to act on behalf of HSBC as its servicing agent. Ocwen admits that the Debtor's bankruptcy filing was announced at the foreclosure sale and that HSBC then bid through its agent, Mr. Didonato. Mr. Didonato was hired, albeit indirectly, by the Shapiro & DiCaro firm, another agent of Ocwen, which is in turn an agent of HSBC, to represent HSBC at the foreclosure sale. The Referee testified that he contacted an entity called FIS Agency Sales & Posting ("FIS") to ask if the foreclosure sale would be going forward. Tr. at 36. The Court asked why the Referee would contact FIS, rather than HSBC, Ocwen, or the Shapiro & DiCaro firm. Mr. DiCaro explained:

> FIS is a – sort of a statewide company that coordinates matters for court services. In other words, Mr. Didonato's company – he works for [Nationwide Court Service]. They were hired, in effect, by FIS. Our direct contact was with FIS, not with Nationwide. And Nationwide's one of the groups that works for – I mean, FIS has some people that work for them directly and they have some that are hired by them in different parts of the state.

Tr. at 36. It appears, and has not been suggested otherwise, that the Shapiro & DiCaro firm was acting within the scope of its authority as an agent of Ocwen in hiring Mr. Didonato via FIS and Nationwide Court Service on behalf of HSBC.

"[A]ny deliberate act taken in violation of a stay, which the violator knows to be in existence, justifies an award of actual damages." *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1105 (2d Cir. 1990). "Such an act need not be performed with specific intent to violate the stay. Rather, so long as the violator possessed 'general intent in taking actions which have the effect of violating the automatic stay,' the intent requirement . . . is satisfied." *In re Sucre*, 226 B.R. 340, 346 (Bankr. S.D.N.Y. 1998) (quoting *In re Chateaugay Corp.*, 112 B.R. 526, 529 (S.D.N.Y. 1990), *rev'd on other grounds,* 920 F.2d 183 (2d Cir. 1990)).

"[U]nlike natural persons, corporations can do nothing except through the agency of others." *Oliner v. Mid-Town Promoters, Inc.*, 2 N.Y.2d 63, 64, 156 N.Y.S.2d 833 (1956).

> Agency is a legal relationship between a principal and an agent. It is a fiduciary relationship which results from the manifestation of consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act.

*Maurillo v. Park Slope U-Haul*, 194 A.D.2d 142, 146, 606 N.Y.S.2d 243 (N.Y. App. Div. 2d Dep't. 1993) (citing Restatement (Second) of Agency § 1).

There is no dispute that Mr. Didonato had authority to bid on behalf of HSBC at the foreclosure sale and did so. Based upon Mr. Didonato's bid, HSBC was declared the "successful bidder." It follows that if Mr. Didonato willfully violated the stay in exercising the authority to bid on HSBC's behalf, HSBC is liable for damages pursuant to 11 U.S.C. § 362(k)(1). "Generally, principals are liable for the acts of their agents performing within the scope of their apparent authority." *News America Mktg., Inc. v. LePage Bakeries, Inc.*, 16 A.D.3d 146, 791 N.Y.S.2d 80 (N.Y. App. Div. 1st Dep't. 2005). "Under the doctrine of respondeat superior, a principal is liable for the negligent acts committed by its agent within the scope of the agency." *Fils-Aime v. Ryder TRS, Inc.*, 40 A.D.3d 917, 918, 837 N.Y.S.2d 199 (N.Y. App. Div. 2d Dep't. 2007) (citations omitted).

"The law is well settled that, unless obtained confidentially, knowledge acquired by an agent acting within the scope of his [or her] agency is imputed to his [or her] principal and the latter is bound by such knowledge." *Bauer v. CS-Graces, LLC*, 48 A.D.3d 922, 852 N.Y.S.2d 416 (N.Y. App. Div. 3d Dep't. 2008) (alterations in original) (citations and internal quotations omitted). Thus, where notice of a bankruptcy filing has been provided to a sub-agent, or in this case to one agent in a convoluted system of agents, subagents and servicers, the principal becomes liable for any violation of the automatic stay committed by those agents or sub-agents.

> Once notice is given of the filing, a creditor is subject to the full force of the
> automatic stay, and is subject to all penalties for violation thereof. Such notice
> may be oral or written, and may be given by any means and in any manner.
> While service of such notice in the manner provided for a summons and
> complaint is permitted, it is not required.

*In re Stucka*, *supra*, 77 B.R. at 781; *see also Mallis v. Bankers Trust Co.*, 717 F.2d 683, 689 n. 9

(2d Cir. 1983) 689 n. 9 ("basic tenet" of law of agency that knowledge of agent is imputed to

principal).

Attorneys are also presumed to act with authority from – and as agents of – their clients.

"Any other notion would be wholly inconsistent with our system of representative litigation, in

which each party is deemed bound by the acts of his lawyer-agent . . . ." *Link v. Wabash R.R.

Co.*, 370 U.S. 626, 634, 82 S.Ct. 1386, 1390 (1962); *See also Chira v. Lockheed Aircraft Corp.*,

367 B.R. 54, 67 (2d Cir. 1980) ("absent a truly extraordinary situation," client is not excused

from consequences of attorney's nonfeasance); *In re Artha Mgmt.*, 1995 WL 606252, *8

(S.D.N.Y. Oct. 12, 1995) (citing cases); *In re Linzer*, 264 B.R. 243, 248 (Bankr. E.D.N.Y. 2001)

(general rule in agency law that "adequate notice to or actual knowledge acquired by an agent is

imputed to the principal" applies to relation of attorney and client).

The same agency rules apply to sub-agents. In *In re Withrow*, 93 B.R. 436 (Bankr.

W.D.N.C. 1988), a credit card company willfully violated the automatic stay where the debtor

provided notice of his filing to an attorney representing a collection agency that the credit card

company's servicing agent and sister corporation retained to collect on the debtor's delinquent

account. *Id.* at 437. The bankruptcy court imputed knowledge of the bankruptcy filing to the

credit card company, and actions by its other agents constituted a willful violation of the

automatic stay. *Id.* at 438. In so holding, the *Withrow* court observed that the credit card

company elected to operate through a complex, "convoluted system of agents, subagents and

sister corporations" that was likely to produce stay violations and could not assert the results of

that complex system as a defense. *Id.* at 439; *see also* 2A N.Y. Jur. 2d Agency § 166 (relation of

agency exists between the principal and an authorized subagent). An analogous line of cases

holds that even a large government agency such as the Internal Revenue Service "may not shield

their violations of the stay . . . by erecting a blind of 'complexity'." *In re Stucka*, *supra*, 77 B.R.

at 783. The inability of a bureaucracy to react in a timely manner to a bankruptcy filing by

providing actual notice to its collection agents is not an excuse for violating the automatic stay.

*In re Santa Rosa Truck Stop, Inc.*, 74 B.R. 641, 643 (Bankr. N.D. Fla. 1987) ("If the automatic

stay is to afford any meaningful protection to a debtor attempting to reorganize, it must be

enforced against the colossus of the I.R.S. just as it is against individual and corporate creditors

who may persist in their collection efforts after a petition for relief has been filed."); *see also In*

*re Lile*, 103 B.R. 830, 837 (Bankr. S.D. Tex. 1989) (agent's actions were deliberate and

intentional and constituted willful conduct on the part of the IRS); *In re Price*, 103 B.R. 989, 993

(Bankr. N.D. Ill. 1989) (IRS charged with knowledge of its agents; size and complexity does not

excuse disregard for the automatic stay).

The Referee notified Mr. Didonato at the foreclosure sale that a bankruptcy petition had

been filed, and that notice is imputed to HSBC. The Court simply cannot believe Mr. Didonato's

testimony that he does not remember Mr. Crawford or a single thing that happened or was said at

the foreclosure sale. Even when Mr. Didonato's testimony is taken at face value, his inability to

remember neither confirms nor contradicts the testimony of the Referee and Mr. Crawford, who

provided substantially consistent accounts of what transpired at the foreclosure sale. The

Referee testified that he announced the bankruptcy filing a second time after Mr. Didonato

handed him the terms of sale. Tr. at 39. The Referee also testified that he told Mr. Didonato after

conducting the sale that there was a bankruptcy filing and that he did not know if the sale was

valid and refused to hand Mr. Didonato a signed deed. Tr. at 40.  Based upon all of the testimony

at the April 28, 2008 hearing, the Court finds that Mr. Didonato had actual notice of the Debtor's

bankruptcy filing and bid at the sale in willful violation of the automatic stay.  Mr. Didonato's

failure to recall that notice is extremely unlikely given his testimony that if he "heard the word

bankruptcy stated" he would have notified his employer, Nationwide Court Service, which

would notify the Shapiro & Dicaro firm. Tr. at 29.  Although Mr. Didonato avoided a direct

answer to the Court's question about the paperwork in this case (Tr. at 27), the Referee testified

that he did not sign the terms of sale or memorandum of sale and return those documents to Mr.

Didonato as he normally would, with the necessary signature. Tr. at 40.  It is also unlikely that

Mr. Didonato would not recall this irregularity in the paperwork that, according to his testimony,

he normally has signed by a referee before it is returned to his office or the creditor's attorney.

Tr. at 27.  Mr. Didonato's conduct in this case and testimony before the Court resemble facts in

*In re Gagliardi*, 290 B.R. 808, 813 (Bankr. D. Colo. 2003), where the bankruptcy court held a

loan servicer and its attorneys liable for a willful violation of the stay and assessed punitive

damages where the attorney continued an eviction hearing post-petition, eventually evicting the

debtor's mentally disabled nephew from property in which the debtor retained an interest.  In the

*Gagliardi* case, the debtor testified that prior to an eviction hearing, he informed a real estate

broker retained by the loan servicer's attorneys that a petition had been filed; the broker disputed

the testimony, but the court found the debtor to be more credible. *Id*. at 813.  The loan servicer

and its attorney claimed that they had not received notice of the bankruptcy filing until after the

eviction had been accomplished. *Id.*  When presented with a transcript of the state court eviction

hearing, in which the debtor's bankruptcy filing was announced and acknowledged by the loan

servicer's attorney, the loan servicer's attorney "apologized to the Court for his faulty memory." *Id*.

In the Post-Hearing Memorandum of Law (ECF Docket No. 17; hereafter, the "Post-Hearing Memo"), Ocwen suggests that its "only alleged error thus is showing up to a previously scheduled auction and not walking away once the fact of a bankruptcy petition was announced to the assembled bidders." Ocwen argues:

> Mr. Didonato's subjective knowledge of the existence of a bankruptcy petition is not dispositive; the question is not whether Mr. Didonato knew of the petition, but whether he knowingly violated the automatic stay – a standard that requires him to have taken an affirmative act that violated the stay. In fact, the act that is alleged to have violated the stay – the conduct of a foreclosure auction – was not committed by Mr. Didonato at all.

Post-Hearing Memo, p. 6. The Court rejects Ocwen's view of November 27, 2007 sale. Elsewhere in the Post-Hearing Memo, Ocwen agrees that Mr. Didonato, an agent for HSBC, "gave Mr. Mora Ocwen's bid," and "reported that the property reverted to HSBC," at which point Ocwen "began efforts to market the property by contacting a realtor." *Id.*, p. 3-4. Ocwen does not explain how Mr. Didonato's bid at the foreclosure sale scheduled by HSBC did not constitute "an affirmative act that violated the stay" or how anyone could be identified as the successful bidder at an auction sale in the absence of some sort of affirmative act. Following Mr. Didonato's bid, Ocwen states that he "reported that the property reverted to HSBC," and Ocwen then began marketing the Debtor's property, based upon Mr. Didonato's report.[5]

---

[5]    The Court is baffled by another of Ocwen's arguments:

> Mr. Didonato's testimony was that he did not recall what took place at the sale. It is clear, however, that the Referee indicated to everyone, apparently including Mr. Didonato, that he was going to make a determination about whether or not the sale he was conducing [sic] was valid. Mr. Didonato appears to have concluded that Mr. Mora would contact the parties regarding his determination of validity. As a result, he only reported that the property reverted to HSBC, rather than indicating that a bankruptcy petition had been filed.

Post-Hearing Memo, p. 10. This argument speculates as to what Mr. Didonato did or did not conclude, and why, and is not supported by testimony from Mr. Didonato or anyone else. It appears to be an attempt to show that

Unlike the Referee, Mr. Didonato does not argue that he was confused about the legal implications of the bankruptcy filing.  For purposes of finding a willful violation of the automatic stay, Mr. Didonato's inability to recall, five months later, that he received notice of the bankruptcy filing before bidding on the Debtor's property is of no more relevance than the Referee's failure to understand the effect of the bankruptcy filing.  All that is required for a willful violation of the automatic stay is a deliberate act taken in violation of a stay, which the violator knows to be in existence. *In re Crysen/Montenay Energy Co.*, *supra*, 902 F.2d at 1105. Each of these factors were satisfied in this case.  For the foregoing reasons, the Court finds that the actions of Mr. Didonato constitute a willful violation of the automatic stay, attributable to the principal, HSBC.

A principal that conducts activity through an agent will be liable to third parties harmed by the agent when that harm was caused by the principal's negligence in selecting, training, retaining, supervising, or otherwise controlling the agent. Restatement (Third) of Agency § 7.05. *See Weiss v. Furniture-In-The-Raw*, 62 Misc.2d 283, 285, 306 N.Y.S.2d 253, 255 (N.Y. Civ. Ct. 1969) (employer liable for failure to instruct sub-agent, hired "at random 'off the street'" as to the manner in which he was to conduct himself) (citing Restatement (Second) of Agency § 213). A principal is also liable to a third party harmed by an agent's tortious conduct. Restatement (Third) of Agency § 7.03 (2006).  The Court's Order to Show Cause directed HSBC to appear. Rather than appear through one of its officers, HSBC sent its servicing agent, Ocwen, and Ocwen was represented by the Shapiro & DiCaro firm.  The first response, filed by Shapiro & DiCaro, disclosed only what Shapiro & DiCaro's records reflected, not Ocwen's or HSBC's records.  Ocwen then filed an affidavit indicating what its records reflected.  HSBC has never

---

Ocwen and HSBC did not receive actual notice of the bankruptcy filing from Mr. Didonato.  The cases discussed in this decision make clear that HSBC did not need to receive actual notice from Mr. Didonato, because as HSBC's agent, Mr. Didonato's knowledge was imputed to HSBC.

offered any evidence or testimony as to what its records reflected or when it received actual
notice of the filing.  HSBC, the party identified as the "successful bidder" at the foreclosure sale,
and the party named in the proof of claim filed in this case, chose to ignore this Court's Order to
Show Cause, sending its servicing agent instead.  As Bankruptcy Judge Joel B. Rosenthal
recently stated: "The Court does not accept that one can **simply by contract** sever the benefits
and burdens associated with residential mortgage lending." *In re Nosek*, 2008 WL 1899845, *8
(Bankr. D. Mass. April 25, 2008) (emphasis added).  The fact that HSBC sent its servicing agent
in its place to "take one for the team" does not constrain this Court to sanction only the agent.
As discussed above, the acts of HSBC's agents bind HSBC.  The Court has construed all of the
arguments made by Ocwen and Shapiro & DiCaro as if they were also made on behalf of HSBC
and ultimately found that HSBC's agents willfully violated the stay.  Consequently, as the
principal, HSBC is liable.

Mr. Didonato is also personally liable for willfully violating the automatic stay. *See In re
Vazquez*, 221 B.R. 222, 231 (Bankr. N.D. Ill. 1998) (creditor and its attorney were jointly and
severally liable for violation of discharge injunction "because under general principles of agency
law, an agent whose tortious conduct renders the principal liable is also liable for his own
tortious acts"); *In re Davis*, 177 B.R. 907, 911 (B.A.P. 9th Cir. 1995) ("Willful violation of the
automatic stay is an intentional tort for which compensatory and punitive damages may be
awarded."); *In re Skaggs*, 183 B.R. 129, 130 (Bankr. E.D. Ky. 1995) (same); Restatement
(Third) of Agency § 7.01 (2008) (agent is subject to liability to a third party harmed by the
agent's tortious conduct even when acting as an agent).

## B.   The Referee [6]

There is also no dispute that the Referee was aware of the bankruptcy filing before proceeding with the foreclosure sale.  By his own testimony, the Referee was uncertain whether the filing would stay the sale. Tr. at 39.  He chose to announce the fact that the filing had occurred and then proceed with the sale and find out later if the bankruptcy petition "was an accurate and true filing." *Id.*  These actions are sufficient to constitute a willful violation of the stay. 11 U.S.C. § 362(a)(1).  A referee who has knowledge of a bankruptcy filing is not at liberty to proceed with a foreclosure sale with a "caveat," that the sale will be null and void if it violates the automatic stay.  The sale will be void, regardless, and such a caveat does nothing to avert the intentional violation of the stay that follows.

Once a party receives reasonable, actual notice of a bankruptcy filing, that party has the responsibility to ensure the stay is not violated. *In re Lickman*, 297 B.R. 162, 192 (Bankr. M.D. Fla. 2003).  The responsibility includes a duty to seek further information as to the applicability and scope of the automatic stay and the risk of damages for failure to obtain leave or clarification from the bankruptcy court. *Id.* at 192-193.  The Tenth Circuit recently upheld sanctions against a creditor for willfully violating the automatic stay after the debtors' attorney informed the creditor's vice president of the bankruptcy filing by telephone. *In re Johnson*, 501 F.3d 1163, 1172 (10th Cir. 2007).  The debtors' attorney did not provide documentary proof of the filing,

---

[6]    The Referee notes in his May 12, 2008 letter (ECF Docket No. 20): "I am an 'agent of the court, a mere ministerial officer appointed to conduct a judicial sale in the foreclosure action of the property'," quoting *Bey v. Bey*, 17 Misc.3d 1110, 851 N.Y.S.2d 62 (N.Y. Sup. Ct. 2007).  The case quoted by the Referee stands for the proposition that referees are not authorized to alter the terms of sale fixed by a judgment of foreclosure.  The Court suspects that the case is cited to show that the Referee, as an "agent of the court," was not an agent of HSBC as Mr. Crawford implied.  The Court of Appeals has held that private lawyers appointed as referees in mortgage foreclosure proceedings are independent contractors, not state employees. *O'Brien v. Spitzer*, 7 N.Y.3d 239, 851 N.E.2d 1195 (N.Y. 2006).  In *O'Brien*, an independent contractor was defined as "[a] person who works for another subject to less extensive control" than that of an employee. 7 N.Y.3d at 242.  An independent contractor may or may not be an agent with authority to bind a principal. *See In re Robert Landau Assocs.*, 56 B.R. 648, 652 (Bankr. S.D.N.Y. 1986). For the purposes of this decision, the Court holds only that the Referee was neither an independent contractor nor an agent of HSBC.

and the vice president "'called several employees in to sound it off them' because he was suspicious about the veracity of the attorney's assertions" and did not believe that enough time had passed since the debtors' previous filing to permit them to refile. *Id.* The Tenth Circuit upheld the bankruptcy court's finding that the telephone call placed the creditor on actual notice, and the creditor had the responsibility to investigate further if it doubted the veracity of the debtor's attorney. *Id.* The vice president's good-faith belief was irrelevant. *Id.* at 1173. Though the Court does not question the Referee's good faith in this case, a party cannot avoid liability for an admittedly willful violation of the stay by professing a failure to understand the legal implications of the automatic stay.

### C. <u>Damages</u>

Where the Court finds that a willful violation of the stay has occurred, the award of actual damages is mandatory under 11 U.S.C. § 362(k)(1). At the Court's direction, Mr. Crawford filed a list of out-of-pocket expenses that he incurred in the course of attending and participating in hearings before this Court on behalf of himself and the Debtor. ECF Docket No. 19. Those damages, a total of $66.88, will be awarded against HSBC, Mr. Didonato and the Referee, jointly and severally.

Exhibit C to the proof of claim filed by HSBC in this case December 12, 2007, is captioned "Pre-Petition Fee, Costs & Property Preservation Expenses Breakdown" in the following description and amounts:

| Foreclosure Fee | $440.00 |
| Foreclosure Cost | $95.00 |
| Foreclosure Cost | $90.00 |
| Foreclosure Cost | $70.00 |
| Foreclosure Cost | $550.00 |
| Foreclosure Cost | $407.57 |
| Foreclosure Cost | $1,504.77 |
| Foreclosure Cost | $280.00 |

| | |
|---|---|
| Foreclosure Cost | $75.00 |
| Foreclosure Cost | $1,250.00 |
| Foreclosure Cost | $2,585.50 |
| Foreclosure Cost | $150.00 |
| Foreclosure Cost | $35.50 |
| Foreclosure Cost | $210.00 |
| Foreclosure Fee | $810.00 |

These Foreclosure Costs and Foreclosure Fees total $8,553.34.  HSBC's proof of claim does not

indicate when these costs were incurred, and no further detail is provided.  Ms. Dybas testified

that some of these charges were incurred by Ocwen in connection with the November 27, 2007

foreclosure sale. Tr. at 21-23.  With no dates for the various costs and fees, Ms. Dybas was not

able to provide testimony as to whether the proof of claim included charges relating to the

November 27, 2007 foreclosure sale that violated the automatic stay. *Id.*  As part of the damage

award for violating the automatic stay, the Court will also, *sua sponte*, enter an order striking all

of these charges from the proof of claim.  The Court will also strike the four separate charges

totaling $1,025 for "Bankruptcy Costs" and "Bankruptcy Fees" in Exhibit C to HSBC's proof of

claim. *Cf. In re Sullivan*, 367 B.R. 54, 63 (Bankr. N.D.N.Y. 2007) (holding Shapiro & DiCaro

firm in violation of stay for attempting to collect legal fees from debtor in "payoff letter" and

ruling that firm was not entitled to collect those fees from Chapter 13 debtor).  The order will be

without prejudice to HSBC's right to file an amended proof of claim with proper documentation

and evidence of the date and purpose for which these charges were incurred and without

prejudice to HSBC's right to move for reconsideration pursuant to Fed. R. Bank. P. 3008.

## II.    **PUNITIVE DAMAGES**

### A.    **HSBC and Didonato**

Where a party has willfully violated the automatic stay, "[a]n additional finding of

maliciousness or bad faith on the part of the offending creditor warrants the further imposition of

punitive damages." *In re Crysen/Montenay Energy Co., supra*, 902 F.2d at 1105. *See, e.g., In re*

*Marine Pollution Serv.*, 99 B.R. 210, 217-218 (Bankr. S.D.N.Y. 1989) (awarding punitive

damages of $2,000 for "arrogant defiance" of Bankruptcy Code and "engaged in a calculated

method of self-help"); *In re Baker*, 140 B.R. 88, 91 (D. Vt. 1992) (affirming bankruptcy court's

award of $10,000 in punitive damages where "debtor and her attorney spoke with representatives

of the bank on more than one occasion in order to inform it of debtor's bankrupt status" and

"[t]he only explanation for the bank's violation of the automatic stay can be malice or bad

faith.").  In determining whether punitive damages are appropriate, many courts consider the

factors set forth in *In re B. Cohen & Sons Caterers, Inc.*, 108 B.R. 482, 487 (E.D. Pa. 1989): (1)

the nature of the defendant's conduct; (2) the defendant's ability to pay; (3) the defendant's

motives; and (4) any provocation by the debtor.  As a fifth factor, some courts have considered

the defendant's level of sophistication. *See In re Gagliardi*, *supra*, 290 B.R. at 820 (citing *In re*

*Diviney*, 225 B.R. 762, 776 (B.A.P. 10th Cir. 1998)).

"Punitive damages are proper as a deterrent to those entities who willfully violate the

automatic stay provisions, even if actual damages are minimal." *In re Lile, supra*, 103 B.R. at

841 (imposing punitive damages of $100,000 against IRS to deter willful violations in future;

debtor's actual damages totaled $450).  In *re Lukach*, 2007 WL 1365436, *6 (Bankr.

E.D.N.Y. May 8, 2007), a credit card company described by Bankruptcy Judge Dorothy

Eisenberg as "a giant in the credit industry" continued to contact the debtor in spite of "ample

notice" of the bankruptcy filing and letters from the debtor's bankruptcy counsel.  Though

acknowledging that the notices sent by the creditor were "not so egregious as to warrant the

imposition of an overly large punitive damage award," Judge Eisenberg held that punitive

damages of $5,000 were appropriate to deter that creditor "and other lenders of the same type

from engaging in conduct which violates the automatic stay." *Id.* at *6.

> In determining the appropriate amount of punitive damages, the Court must
> consider the nature of the Respondents' conduct, the ability to pay, and the
> amount of actual damages awarded. The amount of punitive damages should be
> sufficient to deter the Respondents, and similarly situated parties in the future,
> from unilaterally determining the scope and effect of the automatic stay.

*In re Gagliardi*, *supra*, 290 B.R. at 822 ($10,000 punitive sanction against mortgage holder and

attorneys).  The bankruptcy court in *In re GGSI Liquidation Inc.*, 355 B.R. 691, 703 (Bankr.

N.D. Ill. 2006) awarded punitive damages of $100,000 against a bank and the entity it

collaborated with in violating the stay, where their conduct exhibited "callous indifference to

bankruptcy law" and where the award would "deter parties in other cases who are tempted to

play the same game."

Punitive damages are appropriate in this case against HSBC and Mr. Didonato.  As the

Court has found, Mr. Didonato's bid at the foreclosure sale was an intentional and deliberate

violation of the stay.  His indifference, both at the time of sale and at the April 28, 2008 hearing

was evident to the Court.  Unlike the Referee, HSBC never argued that there was any confusion

on the part of Mr. Didonato as to the effect of the Debtor's bankruptcy filing.  Mr. Didonato

confirmed in testimony that he "would have made a phone call" if he had heard the word

"bankruptcy." Tr. at 29.  Mr. Didonato only testified, unpersuasively, that he could not recall

anything that happened at the sale.  As discussed previously, corporate entities such as HSBC

can only act through their agents, sub-agents, sub-sub agents, and so on.  The acts of Mr.

Didonato are attributed to HSBC, which bears responsibility for them.

In the Court's view, punitive damages are necessary against HSBC to deter such conduct in the future.  In so holding, it is not only the conduct of Mr. Didonato at the foreclosure sale, but the system of agents and sub-agents that HSBC utilizes to accomplish even the simple task of bidding at its own scheduled foreclosure sale.  With a chain of communication and instruction at least six layers deep,[7] it is not surprising that a stay violation occurred somewhere along the line. The fact that HSBC prefers to operate in a manner that resembles a Rube Goldberg apparatus[8] is not an excuse when a stay violation occurs.  On the contrary, an award of punitive damages is justified to prevent the likelihood of a malfunction in the future. As noted, the Court is troubled by the fact that HSBC elected to respond to the Order to Show Cause, which was specifically directed to HSBC, by sending a servicing agent.  This is another example of HSBC's institutional indifference and supports the Court's belief that punitive damages are necessary in order to get the attention of the principal creditor in this case.

HSBC argues, through Ocwen, that "the speed of unfolding events doubtless caused confusion at the foreclosure auction since Ms. Crawford's Chapter 13 petition had been filed literally on the eve of the auction . . . ." Post-Hearing Memo, p. 2.  The Court has found that there was no confusion here on the part of Mr. Didonato – and thus HSBC – that a bankruptcy petition had been filed and the automatic stay in effect at the time HSBC bid at the foreclosure sale. Mr. Crawford was present at the sale with a copy of the bankruptcy petition, and the Referee informed HSBC's agent of the bankruptcy.  While Mr. Crawford misdirected his fax of the petition the day before, it is ultimately HSBC's convoluted system that lead to the

---

[7]      HSBC, which is itself a "Trustee for the registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2004-IN1, Asset Backed Pass-Through Certificates," utilizes Ocwen as its servicing agent.  Ocwen, acting on behalf of HSBC, retained the Shapiro & DiCaro firm to represent HSBC in the foreclosure action and sale. Shapiro & DiCaro contacted FIS.  FIS engaged Nationwide Court Service on behalf of HSBC.  Nationwide Court Service sent Mr. Didonato to appear at the foreclosure sale to bid on behalf of HSBC.

[8]      http://en.wikipedia.org/wiki/Rube_goldberg.

circumstances in this case, culminating in Mr. Didonato's willful violation of the stay. The

petition in this case was time-stamped, and thus filed, at Noon on November 26, 2007 and

entered on the docket at 12:06 p.m. on the same day. HSBC could have easily and inexpensively

conducted an on-line search on the afternoon prior to the sale or the morning of the sale. Such a

search would have revealed the Debtor's bankruptcy filing (which included the name of one of

the defendants and the address of the property subject to the foreclosure sale), and this would

have enabled HSBC to cancel the foreclosure sale. Thus, HSBC's invocation of the "eve of

foreclosure" defense to excuse its stay violation in this case is insufficient. Bankruptcy filings on

the day prior to a scheduled foreclosure sale are a common reality and certain to occur in the

future. The fact that HSBC does not appear to be equipped to react to such filings in a timely

fashion supports an award of punitive damages in this case. Blaming the Referee, Ocwen

argues: "There was no way for [Mr. Didonato] to have taken any step to prevent the foreclosure

sale even if he believed it was within his power to do so." Post-Hearing Memo, p. 6.

> It is well settled that a creditor has an affirmative duty under § 362 to take the
> necessary steps to discontinue its collection activities against a debtor. *Sucre v.
> MIC Leasing Corp. (In re Sucre),* 226 B.R. 340, 347 (Bankr.S.D.N.Y.1998). "The
> provisions of the automatic stay place the responsibility to discontinue any
> pending collection proceedings squarely on the shoulders of the creditor who
> initiated the action." *Id.*

*In re Wright*, 328 B.R. 660, 663 (Bankr. E.D.N.Y. 2005). This argument ignores the fact that the

Referee unsuccessfully attempted to contact HSBC prior to the sale, placing a "going forward"

call to FIS. The response to Ocwen's argument is that there was no way that the Referee would

have conducted the sale if he had been notified by HSBC that he should not do so. This would

have been possible if HSBC had not operated through a fragmented system of uninformed agents

such as Mr. Didonato who, as Ocwen now implies, only had the authority to bid on behalf of

HSBC at the sale, but could abstain from bidding.

In arguing against punitive sanctions as a deterrent, Ocwen states that it is "very unusual that a Referee, given a copy of a bankruptcy petition, would conduct a foreclosure sale" and that punitive damages are not necessary to deter lenders' actions in the future because "it is very difficult to understand how they could be recreated." Post-Hearing Memo, p. 10. Ocwen misses the point by focusing on the source of the notice and not on the fact that, having received actual notice of the automatic stay, HSBC's agent proceeded to bid on the property anyway.

As noted previously, Ocwen places all blame on the Referee:

> The occurrence of the foreclosure auction thus cannot be blamed on Ocwen; it was Mr. Mora, the state court's designated representative, who made the decision to conduct the auction. Mr. Didonato's only involvement was attending and participating in reliance on Mr. Mora's direction.

Post-Hearing Memo, p. 6. Mr. Didonato did not testify that he participated in reliance on any direction from the Referee. Mr. Didonato's testimony was that he could not remember anything and did not remember "anybody saying anything." Tr. at 27. Ocwen glosses over Mr. Didonato's role in bidding on the property. Ocwen also argues that the Court should not assess punitive damages in this case because courts normally impose punitive damages where creditors took title or possession of debtors' property, which did not occur here. Post-Hearing Memo, p. 2, 11 n. 1. Although Ocwen blames the Referee for conducting the sale, testimony revealed that the Referee refused to sign the terms of sale, memorandum of sale or deed. If not for the Referee, HSBC *would* have acquired title to the Debtor's property at the November 27, 2007 sale. HSBC's agent reported that, even though the Referee refused to sign and return paperwork to him, as far as he was concerned, the property had "reverted" to HSBC. HSBC then began to "sell" the Debtor's property by engaging a realtor to market the property, without waiting for a deed. Thus, without a signed deed, HSBC's agents engaged realtors to repeatedly call a physically frail Debtor, asking when she would be vacating the property.

For all of the foregoing reasons, the Court finds that an award of punitive damages is appropriate based on the conduct of HSBC's agent, and such an award is necessary to discourage this conduct by HSBC and its agents in the future.  The size and complexity of HSBC's system of agents, subagents and servicing agents is relevant to the amount of sanctions that will be necessary as a deterrent to their conduct in the future.  It is the Court's decision, based upon the facts of this case, that punitive damages in the amount of $60,000 be awarded against HSBC (amounting to $10,000 per layer, including principal, servicing agent and various agents and sub-agents), in favor of the Debtor.

An award of punitive damages against Mr. Didonato is also appropriate in view of his deliberate and indifferent conduct, as described at length in this decision.  No evidence has been submitted as to Mr. Didonato's ability to pay, and the Court cannot make a determination as to the amount of punitive damages that will be necessary to deter his conduct in the future.  Accordingly, the Court will schedule a further hearing to give Mr. Didonato an opportunity to appear and present testimony and evidence, but only with regard to these two issues.

## B.     The Referee

It was clear from the Referee's testimony that although he willfully violated the automatic stay, he did so due to confusion about the legal effect of the bankruptcy filing.  For example, the Referee stated at the February 5, 2008 hearing that he "read the petition and it didn't say it stayed the sale."  The Referee testified at the April 28, 2008 hearing that he believed that this bankruptcy filing, the Debtor's first, was Mr. Crawford's second bankruptcy filing, and that a second filing would not operate as a stay of the foreclosure sale. Tr. at 49.  The Referee was wrong on both counts.  The Referee also testified that this was the first time that a party

other than the plaintiff in the foreclosure sale approached him at a sale claiming that a

bankruptcy petition had been filed. Tr. at 48.

The day after the sale, the Referee learned that the sale was void *ab initio*, and he

immediately informed Mr. Crawford and took all of the actions necessary to cancel the sale.  The

Referee admits that he made a mistake, took responsibility for the error, and apologized on

several occasions not only to the Debtor but to the Court and to all parties involved.  The Referee

has repeatedly promised, most recently in a letter dated May 12, 2008, that he will "never let this

happen again." ECF Docket No. 20.  The Court is convinced, and does not find that the Referee

acted with malice or bad faith.  The Court will not award punitive damages against the Referee.

Mr. Mora testified that he was not required to take classes or specialized training in order to

qualify as a referee. Tr. at 49.  The Court notes this lack of training with concern that other court-

appointed referees do not make the same mistake in the future.

## **CONCLUSION**

For the foregoing reasons, the Court will issue a separate order: (1) declaring the

November 27, 2007 foreclosure sale invalid and void *ab initio*; (2) holding HSBC, Thomas

Didonato and the Referee jointly and severally liable for damages in the amount of $66.88; (3)

striking (a) $8,553.34 in foreclosure costs and foreclosure fees and (b) four separate charges

totaling $1,025 for "Bankruptcy Costs" and "Bankruptcy Fees" in Exhibit C to HSBC's proof of

claim, without prejudice to HSBC's right to file an amended proof of claim with proper

documentation and evidence of the date and purpose for which these charges were incurred and

without prejudice to HSBC's right to move for reconsideration pursuant to Fed. R. Bank. P.

3008; (4) assessing punitive damages against HSBC in the amount of $60,000, payable to the

Debtor; (5) assessing punitive damages against Thomas Didonato and payable to the Debtor, in

an amount to be set at a further hearing; and (6) barring HSBC, Ocwen, or a subsequent servicer

from collecting fees, expenses or other charges associated with the foreclosure sale or this Order

to Show Cause from the Debtor or Mr. Crawford, or adding such charges, fees or expenses to the

amounts due under the note and mortgage.

Dated: Poughkeepsie, New York
      June 5, 2008                     /s/ Cecelia Morris
                                     CECELIA G. MORRIS
                                     UNITED STATES BANKRUPTCY JUDGE